563 F.2d 216
 16 Fair Empl.Prac.Cas. 1, 15 Empl. Prac. Dec. P 7935
Brian F. WEBER, Individually and on behalf of all other
persons similarly situated, Plaintiffs-Appellees,
v.
KAISER ALUMINUM & CHEMICAL CORPORATION and United
Steelworkers of America, AFL-CIO, Defendants-Appellants.
 No. 76-3266.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 17, 1977.
 
 Robert J. Allen, Jr., Legal Dept. Kaiser Aluminum & Chemical Corp., Oakland, Cal., F. W. Middleton, Jr., Baton Rouge, La., for Kaiser Aluminum, etc.
 John C. Falkenberry, Birmingham, Ala., Michael H. Gottesman, Washington, D. C., Jerry L. Gardner, Jr., New Orleans, La., for United Steelworkers of America.
 Kenneth B. Peterson, Cloyd R. Mellot, Pittsburgh, Pa., for ALCOA, amicus curiae.
 Burt A. Braverman, Washington, D. C., for Reynolds Metal, amicus curiae.
 Michael R. Fontham, New Orleans, La., for Weber.
 John W. Finley, Jr., Brashick and Finley, New York City, Michael Blinick, Ben B. Blackburn, of counsel for Southeastern Legal Foundation, amicus curiae.
 Richard S. Ugelow, Robert T. Moore, James P. Turner, Attys., U. S. Dept. of Justice, Washington, D. C., for USA & E.E.O.C.
 Arnold Forster, New York City, for Anti-Defamation League of B'Nai B'rith.
 Christopher S. Bond, Gene E. Voigts, Kansas City, Mo., for Great Plains Legal Foundation.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before WISDOM, GEE and FAY, Circuit Judges.
 GEE, Circuit Judge:
 
 
 1
 In February 1974, Kaiser Aluminum & Chemical Corporation entered into a collective bargaining agreement with United Steelworkers of America, AFL-CIO (USWA), that significantly altered eligibility for on-the-job training to enter craft positions in all Kaiser plants. In an effort to increase the number of minority workers in the craft families, the 1974 Labor Agreement removed the requirement of prior craft experience for on-the-job training and established an entrance ratio of one minority worker to one white worker until the percentage of minority craft workers roughly approximated the percentage of minority population in the area surrounding each plant. Eligibility for training still rested on plant seniority, but to implement their affirmative action goal it was necessary to establish dual seniority lists: for each two training vacancies, one black and one white employee would be selected on the basis of seniority within their respective racial groups.[1] As predictable, black employees have been admitted to Kaiser's on-the-job training program with less seniority than their white competitors. One unsuccessful white bidder working at Kaiser's Gramercy, Louisiana, plant brought this class action on behalf of all persons employed by Kaiser at its Gramercy works who are members of the USWA Local 5702, who are not members of a minority group and who have applied for or were eligible to apply for on-the-job training programs since February 1, 1974. Mr. Weber alleged that by preferring black employees with less seniority for admission to on-the-job training, Kaiser and USWA were guilty of unlawful discrimination in violation of Title VII, 42 U.S.C. §§ 2000e-2 et seq. (1970). The district court agreed and granted a permanent injunction against further use of the 1974 training eligibility quota. Although the 1974 Labor Agreement applies to all Kaiser plants and similar agreements were enacted through the aluminum industry, these facts pertain only to Kaiser's plant in Gramercy, Louisiana, and this action enjoined the use of the quota at that plant only. Kaiser and USWA, supported by numerous amici curiae,[2] bring this appeal asking us to hold that their training quota, which they say is mandated by valid executive action, does not violate Title VII and is justified by past societal discrimination even in the absence of past employment discrimination here.
 
 
 2
 Affirmative Relief or Reverse Discrimination?
 
 
 3
 The case before this court today is unique in that the affirmative action complained of was not imposed by the judiciary; rather, this collective bargaining agreement was entered into to avoid future litigation and to comply with the threats of the Office of Federal Contract Compliance Programs (OFCC) conditioning federal contracts on appropriate affirmative action.[3] The case is also unique in that it presents a conflict between affirmative action dictated by the OFCC under Executive Order 11246 and preferential treatment prohibited by Title VII. In United States v. Allegheny-Ludlum Industries, Inc., 517 F.2d 826 (5th Cir. 1975), Title VII and Executive Order 11246 dictated the same response to massive discriminatory practices throughout the steel industry, but the training quota adopted by Kaiser in response to Executive Order 11246 is flatly and literally prohibited by Title VII, § 703(d), which makes it unlawful to limit access to on-the-job training on the basis of race:
 
 
 4
 It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.
 
 
 5
 42 U.S.C. § 2000e-2(d) (1970). Additionally, section 703(a) prohibits racial classifications in general,[4] and section 703(j) specifies that the Act shall not require preferential treatment.[5] But, of course, the issue here is not whether preferential treatment is required but whether it is forbidden.
 
 
 6
 When does preferential treatment become illegal reverse discrimination? The answer depends on the law involved, the nature of the affirmative action, and the factual circumstances of the prior discrimination.[6] Federal courts have agreed that the "make whole" objective of Title VII[7] permits and even requires affirmative relief when necessary to correct continuing inequalities created by past discriminatory employment practices.[8] In Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), the Court seems to have adopted this circuit's "rightful-place" doctrine,[9] authorizing fictional seniority in order to place the victims of discrimination in as good a place as they would have enjoyed absent discriminatory hiring practices.
 
 
 7
 Obviously merely to require (respondent) to hire the class three victim of discrimination falls far short of a "make whole" remedy. A concomitant award of the seniority credit he presumptively would have earned but for the wrongful treatment would also seem necessary in the absence of justification for denying that relief. Without an award of seniority dating from the time when he was discriminatorily refused employment, an individual who applies for and obtains employment as an OTR driver pursuant to the District Court's order will never obtain his rightful place in the hierarchy of seniority according to which these various employment benefits are distributed. He will perpetually remain subordinate to persons who, but for the illegal discrimination, would have been in respect to entitlement to these benefits his inferiors. (footnotes omitted).
 
 
 8
 Id., 424 U.S. at 767-68, 96 S.Ct. at 1265-1266. The Court made it clear that an award of artificial seniority may not be denied on the ground that it conflicts with the economic interests of other employees.
 
 
 9
 (I)t is apparent that denial of seniority relief to identifiable victims of racial discrimination on the sole ground that such relief diminishes the expectations of other, arguably innocent, employees would if applied generally frustrate the central "make-whole" objective of Title VII. These conflicting interests of other employees will, of course, always be present in instances where some scarce employment benefit is distributed among employees on the basis of their status in the seniority hierarchy. But, as we have said, there is nothing in the language of Title VII, or its legislative history, to show that Congress intended generally to bar this form of relief to victims of illegal discrimination . . . .
 
 
 10
 Id. at 774, 96 S.Ct. at 1269.
 
 
 11
 The Supreme Court has never approved the use of a quota remedy to overcome employment discrimination, but circuit courts have repeatedly sanctioned judicially imposed quotas in certain factual circumstances. Prior to the 1972 amendments to Title VII, our circuit approved such a quota. Local 53, International Ass'n of Heat & Frost Insulators & Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969). Accord, United States v. International Brotherhood of Electrical Workers, Local 38, 428 F.2d 144, 149-59 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); United States v. Sheetmetal Workers Local 36, 416 F.2d 123 (8th Cir. 1969). In 1972, a Senate amendment to overturn this case law and forbid the use of quota remedies was rejected two-to-one. Legislative History of Equal Employment Opportunity Act of 1972 at 1017, 1042-74, 1081, 1714-17 (1972). The bill amending Title VII in 1972 provided:
 
 
 12
 In any area where the new law does not address itself, or in any areas where a specific contrary intention is not indicated, it was assumed that the present case law as developed by the courts would continue to govern the applicability and construction of Title VII.
 
 
 13
 Subcom. on Labor of the Senate Com. on Labor and Public Welfare, Legislative History, supra at 1844. Since 1972, judicially imposed quota remedies have been widely approved. United States v. International Union of Elevator Constructors Local 5, 538 F.2d 1012 (3d Cir. 1976); EEOC v. Local 638, 532 F.2d 821 (2d Cir. 1976); Boston NAACP v. Beecher, 504 F.2d 1017 (1st Cir. 1974), cert. denied, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); Rios v. Enterprise Association Steamfitters Local 638, 501 F.2d 622 (2d Cir. 1974); NAACP v. Allen, 493 F.2d 614 (5th Cir. 1974); Morrow v. Crisler, 491 F.2d 1053 (5th Cir.) (en banc), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974); United States v. N. L. Industries, Inc., 479 F.2d 354 (8th Cir. 1973); Pennsylvania v. O'Neill, 473 F.2d 1029 (3d Cir. 1973) (en banc); Southern Illinois Builders Association v. Ogilvie, 471 F.2d 680 (7th Cir. 1972); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Carter v. Gallagher, 452 F.2d 315 (8th Cir.) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972). But our courts have not been unaware of the dangers of granting preferential treatment on the basis of race:
 
 
 14
 There are good reasons why the use of racial criteria should be strictly scrutinized and given legal sanction only where compelling need for remedial action can be shown. Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 931-32 (2d Cir. 1969). Government recognition and sanction of racial classifications may be inherently divisive, reinforcing prejudices, confirming perceived differences between the races, and weakening the government's educative role on behalf of equality and neutrality. It may also have unexpected results, such as the development of indicia for placing individuals into different racial categories. Once racial classifications are imbedded in the law, their purpose may become perverted: a benign preference under certain conditions may shade into a malignant preference at other times. Moreover, a racial preference for members of one minority might result in discrimination against another minority, a higher proportion of whose members had previously enjoyed access to a certain opportunity. (footnotes omitted).
 
 
 15
 Associated General Contractors of Massachusetts, Inc. v. Altshuler, 490 F.2d 9, 17-18 (1st Cir. 1973). Three circuits have refused to approve racial quotas when the factual circumstances of the past or present discrimination did not dictate such an extraordinary remedy. Patterson v. American Tobacco Co., 535 F.2d 257 (4th Cir. 1976); Chance v. Board of Examiners, supra; Watkins v. United Steelworkers of America Local 2369, 516 F.2d 41 (5th Cir. 1975).
 
 Title VII and Executive Order 11246
 
 16
 Quotas imposed to achieve the "make whole" objective of Title VII rest on a presumption of some prior discrimination. There can be no basis for preferring minority workers if there has been no discriminatory act that displaced them from their "rightful place" in the employment scheme. Several circuits have noted this distinction, holding that quotas or preferential treatment merely to attain racial balance of the work force are unlawful, while quotas to correct past discriminatory practices are not. United States v. Wood, Wire & Metal Lath. International Union Local 46, 471 F.2d 408, 413 (2d Cir. 1973); Carter v. Gallagher, supra at 329; Contractors Association of Eastern Pennsylvania v. Secretary of Labor, 442 F.2d 159, 173 n.47 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); United States v. Ironworkers Local 86, 443 F.2d 544, 553 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); United States v. International Brotherhood of Electrical Workers Local 38, 428 F.2d 144, 149 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); Local 53, International Association of Heat & Frost I. & A. Workers v. Vogler, supra at 1052. But see EEOC v. American Telephone & Telegraph Co., 556 F.2d 167 (3d Cir. 1977); and Associated General Contractors of Massachusetts, Inc. v. Altshuler, supra (Executive Order 11246 may provide an alternative justification for racial quotas totally apart from any violation of Title VII).
 
 
 17
 Courts also have affirmed quota remedies imposed by federal affirmative action programs under the impetus of Executive Order 11246 and comparable state affirmative action programs. Associated General Contractors of Massachusetts, Inc. v. Altshuler, supra; Contractors Association of Eastern Pennsylvania v. Secretary of Labor, supra (the Philadelphia Plan); Weiner v. Cuyahoga Community College District, 19 Ohio St.2d 35, 249 N.E.2d 907 (1969), cert. denied, 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970) (the Cleveland Plan); Joyce v. McCrane, 320 F.Supp. 1284 (D.N.J.1970) (the Newark Plan); Southern Illinois Builders Association v. Ogilvie, supra (the Illinois-Ogilvie Plan). The affirmative action program mandated by 41 C.F.R. § 60-2 (Revised Order No. 4) for nonconstruction contractors requires a "utilization" study to determine minority and female representation in the work force. Goals for hiring and promotion must be set to overcome any "underutilization" found to exist. The regulation then confuses things mightily by declaring that a goal shall not be considered a device for instituting quotas or reverse discrimination:
 
 
 18
 (T)he purpose of a contractor's establishment and use of goals is to insure that he meet his affirmative action obligation. It is not intended and should not be used to discriminate against any applicant or employee because of race, color, religion, sex, or national origin.
 
 
 19
 41 C.F.R. § 60-2.30. Attempts to distinguish a numerical goal from a quota have proved illusory, and most such goals suggested by the OFCC can fairly be characterized as quotas.[10]
 
 
 20
 We must judge the legality of Kaiser's training ratio in light of both Title VII, with its "make-whole" objective, and Executive Order 11246, with its mandate for affirmative action that does not itself discriminate.
 
 1974 Labor Agreement
 
 21
 Petitioner Weber complains of Kaiser's dual seniority system that permits black employees to be admitted to on-the-job training programs ahead of white employees with greater seniority. The offending portions of the 1974 Labor Agreement provide:
 
 
 22
 It is further agreed that the Joint Committee will specifically review the minority representation in the existing Trade, Craft and Assigned Maintenance classifications in the plants set forth below, and, where necessary, establish certain goals and timetables in order to achieve a desired minority ratio: (Gramercy works listed, among others).
 
 
 23
 As apprentice and craft jobs are to be filled, the contractual selection criteria shall be applied in reaching such goals; at a minimum, not less than one minority employee will enter for every nonminority employee entering until the goal is reached unless at a particular time there are insufficient available qualified minority candidates . . ..
 
 
 24
 1974 Labor Agreement, Addendum to Art. 9 dealing with seniority. The Joint Committee entered into a Memorandum of Understanding which established a goal of 39% minority representation in each craft family at the Kaiser Gramercy plant.[11]
 
 
 25
 The one-for-one ratio was then implemented to accomplish this goal.
 
 
 26
 In April, 1974, Kaiser offered bids for on-the-job training opportunities in the craft families of instrument repairman, electrician and general repairman. Following the terms of the 1974 Labor Agreement, one black and one white employee were selected on the basis of seniority within their respective racial groups for the vacancies in the instrument repairman category. Similarly, two trainees, one black and one white, were selected for training in the electrician category, and five trainees, three of whom were black, were selected for the general repairman positions. In each of these three cases, the most senior man in his racial group was selected, but in each case one or more white employees not selected had greater seniority and would have been selected had the quota system not been in effect.
 
 
 27
 It has been admitted by Kaiser that members of minority groups with less seniority than Mr. Weber and other members of the class were selected by Kaiser for these programs specifically to meet the established goal of at least thirty-nine percent minority representation in each craft family.
 
 
 28
 Weber v. Kaiser Aluminum Corp., 415 F.Supp. 761, 764 (E.D.La.1976).
 
 
 29
 It is undeniable that the 1974 Labor Agreement's one-for-one ratio for training eligibility discriminates on the basis of race. In McDonald v. Santa Fe Trails Transportation Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), the Court held that Title VII prohibits racial discrimination against white employees upon the same standards as would be applicable were they Negroes. 427 U.S. at 278-282, 96 S.Ct. at 2577-2578, 49 L.Ed.2d at 500-01. Accord Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (Title VII prohibits preferences for any groups, minority or majority).
 
 
 30
 The district court granted injunctive relief against the complained-of quota system on two grounds:
 
 
 31
 (1) Courts may establish affirmative action programs as a form of relief in Title VII cases, but when an employer and a union voluntarily adopt a quota system this violates Title VII.[12] Quota systems must be imposed with great caution, and only the judiciary should be entrusted with fashioning and administering such relief.
 
 
 32
 (2) Courts would not mandate a preferential quota system in these circumstances where the preferred workers were not identifiable victims of unlawful hiring discrimination and where in fact there had been no past discrimination by the employer.
 
 
 33
 We disagree with the district court's reasoning that what courts may force upon employers in the name of Title VII employers and unions may not voluntarily institute. In United States v. Allegheny-Ludlum Industries, Inc., supra, which dealt with consent decrees eliminating patterns and practices of discrimination in the steel industry, this court emphasized that voluntary compliance in eliminating unfair employment practices is preferable to court action and that private settlement without litigation is the central theme of Title VII. See also Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 258 (5th Cir. 1974); Hutchings v. United States Industries, Inc., 428 F.2d 303, 309 (5th Cir. 1970); Culpepper v. Reynolds Metal Co., 421 F.2d 888, 891 (5th Cir. 1970); Dent v. St. Louis-San Francisco Railway Co., 406 F.2d 399, 402 (5th Cir. 1969); Oatis v. Crown Zellerbach, 398 F.2d 496, 498 (5th Cir. 1968). But there is strong authority to support the position that courts are not subject to the same restrictions as employers. Section 703, which defines unlawful employment practices, does not limit judicial remedies which are governed by the broad language of section 706(g) authorizing "such affirmative action as may be appropriate."Local 5 contends, however, that the enforcement provisions in § 706(g) are in effect limited by the unlawful employment practices prohibitions in §§ 703(h) and (j). The short answer to that contention is that § 703 defines violations, not remedies.
 
 
 34
 United States v. International Union of Elevator Constructors Local 5, supra at 1019. In Franks v. Bowman Transportation Co., supra, the Supreme Court affirmed this view that the definitional section 703(h) does not limit relief otherwise appropriate under section 706(g). We need not now probe into the distinctions between court-ordered remedies and permissible remedies voluntarily hammered out in collective bargaining agreements because we affirm the district court's opinion on the second ground that under the circumstances of this case the hiring ratio could not be approved even had it been judicially imposed.
 
 No Prior Discrimination
 
 35
 The district court found, and appellants all but concede,[13] that Kaiser has not been guilty of any discriminatory hiring or promotion at its Gramercy plant:
 
 
 36
 It was also established by the testimony of Mr. English (Kaiser's industrial relations superintendent at its Gramercy plant) that minority employees at the Gramercy plant accounted for only 14.8 percent of the total labor force at that plant, and that in an attempt to increase this percentage to conform more closely to the percentage of the general population of the community, Kaiser began to hire new employees "at the gate" on a "one white, one black" basis in 1969. The evidence further established that Kaiser had a no-discrimination hiring policy from the time its Gramercy plant opened in 1958, and that none of its black employees who were offered on-the-job training opportunities over more senior white employees pursuant to the 1974 Labor Agreement had been the subject of any prior employment discrimination by Kaiser.
 
 
 37
 With regard to craft positions, Mr. English testified that prior to 1974, only five blacks had been hired into these positions, making the black craft population only 2-2 1/2 percent of the total Gramercy plant craft population. Although this figure might suggest that Kaiser had discriminated against blacks when filling craft positions, Mr. English testified that prior to 1974, Kaiser had vigorously sought trained black craftsmen from the general community. Although its efforts to secure such trained employees included advertising in periodicals and newspapers published primarily for black subscribers, Kaiser found it difficult, if not impossible, to attract trained black craftsmen. (emphasis added).
 
 
 38
 415 F.Supp. at 764. In the absence of prior discrimination a racial quota loses its character as an equitable remedy and must be banned as an unlawful racial preference prohibited by Title VII, § 703(a) and (d). Title VII outlaws preferences for any group, minority or majority, if based on race or other impermissible classifications,[14] but it does not outlaw preferences favoring victims of discrimination. A minority worker who has been kept from his rightful place by discriminatory hiring practices may be entitled to preferential treatment "not because he is Black, but because, and only to the extent that, he has been discriminated against." Chance v. Board of Examiners, supra at 999. If employees who have been arbitrarily favored are deprived of benefits capriciously conferred on them in order that those who were arbitrarily deprived may receive what they should, in fairness, have had to begin with, no law is violated. This is so even if both the class whose rights are restored and the class required to "move over" are defined by race if the original arbitrariness was defined in that manner. And the reason is that no one is being favored or disfavored, advantaged or injured, under these circumstances because of race; rather, those who have been unjustly deprived receive their due and those who have been arbitrarily favored surrender some of the largesse capriciously conferred on them. That these consequences end by race is a mere incident of the fact that they began that way.
 
 
 39
 Appellants urge this court to approve the on-the-job training ratio not to correct past employment discrimination by Kaiser at this plant but to correct a lack of training blamed on past societal discrimination. For surely it is common knowledge that many blacks (and others) have suffered arbitrary discrimination in the society, discrimination still producing effects which they carry with them to the Gramercy plant and elsewhere. Our response is that unless a preference is enacted to restore employees to their rightful places within a particular employment scheme it is strictly forbidden by Title VII. Not all "but-for" consequences of racial discrimination warrant relief under Title VII. Cf. Local 189, United Papermakers & Paperworkers v. United States, supra at 988. Finding no victims of employment discrimination, the Eighth Circuit reversed a racial hiring quota designed to favor less qualified minority applicants over more qualified white applicants:
 
 
 40
 The fact that some unnamed and unknown White person in the distant past may, by reason of past racial discrimination in which the present applicant in no way participated, have received preference over some unidentified minority person with higher qualifications is no justification for discriminating against the present better qualified applicant upon the basis of race.
 
 
 41
 Carter v. Gallagher, supra at 325. Here we do not deal with minority workers less qualified as to skills;[15] presumably each employee seeking admittance to on-the-job training is unskilled for the craft position he or she seeks. Rather, we are confronted with white employees who are more senior than selected black trainees. As noted at the outset, these dual seniority lists, one for black employees and one for white employees, are maintained only for purposes of selecting on-the-job trainees and do not reflect preferential treatment in layoff, recall, transfer assignments, working conditions or any other benefit. But the importance of seniority principles in allocating scarce opportunities such as training for advancement cannot be overlooked.[16] And because we deal here solely with an effect of seniority, it is appropriate to draw the line for application of restorative justice at the Gramercy plant, rather than at the larger universe of all Kaiser operations or indeed about society at large. Seniority is acquired at the plant and operates on a basis neither larger nor smaller than the plant. Whatever other effects societal discrimination may have, it has had by the specific finding of the court below no effect on the seniority of any party here. It is therefore inappropriate to meddle with any party's seniority or with any perquisites attendant upon it, since none has obtained any unfair seniority advantage at the expense of any other. Here, unlike in Franks v. Bowman Transportation Co., supra, there has been no discriminatory refusal to hire and therefore, here, there is no occasion to restore any employee to his rightful place. Accord Watkins v. United Steelworkers of America Local 2369, 516 F.2d 41 (5th Cir. 1975) (a last-hired, first-fired seniority system resulting in the layoff of more blacks than whites is not discriminatory where the individuals who suffered the layoffs were in their rightful place and had never personally experienced prior employment discrimination); Chance v. Board of Examiners, supra (a last-hired, first-fired layoff plan which has never been discriminatory may not be suspended to permit black or Puerto Rican supervisors to keep their jobs in preference to a white supervisor with greater seniority). Where admissions to the craft on-the-job training programs are admittedly and purely functions of seniority and that seniority is untainted by prior discriminatory acts, the one-for-one ratio, whether designed by agreement between Kaiser and USWA or by order of court, has no foundation in restorative justice, and its preference for training minority workers thus violates Title VII. We concur in the district court's opinion that however laudable the objective of training minority workers, Title VII clearly proscribes discriminating against majority workers:
 
 
 42
 Undoubtedly, the laudable objective of promoting job opportunities in our society for members of minority groups has been viewed as a justification for the discrimination against other individuals which almost certainly results from such programs. Prior to the effective date of the 1964 Civil Rights Act, employers may have been free, for whatever motivation, to engage in such discriminatory employment practices. Indeed, it well may be that employers should be permitted to discriminate in an otherwise illegal fashion in order to bring about a national social goal. This Court, however, is not sufficiently skilled in the art of sophistry to justify such discrimination by employers in light of the unequivocable prohibitions against racial discrimination against any individual contained in Sections 703(a) and (d) of the 1964 Act.
 
 
 43
 415 F.Supp. at 769 (original emphasis).
 
 Executive Order 11246
 
 44
 Appellants contend that if this racial quota is not sanctioned by Title VII it is sanctioned by Executive Order 11246 and regulations issued by the Office of Federal Contract Compliance (OFCC) mandating affirmative action by all government contractors. Indeed, the district court found that the 1974 collective bargaining agreement reflected less of a desire on Kaiser's part to train black craft workers than a self-interest in satisfying the OFCC in order to retain lucrative government contracts.
 
 
 45
 Appellees respond that because Kaiser has actively recruited black craft workers it has complied with the executive requirement of affirmative action and is not guilty of "underutilization." They argue that, properly interpreted, Executive Order 11246 would not require a racial quota in these circumstances and that the OFCC improperly threatened the withdrawal of all federal contracts unless this racial preference was enacted.
 
 
 46
 Executive Order 11246, with its implied mandate for affirmative action on the part of those who would supply the government with goods or services, has been upheld as valid executive action. Contractors Association of Eastern Pennsylvania v. Secretary of Labor, supra at 166-71 (upholding the "Philadelphia Plan"); see also Farkas v. Texas Instruments, Inc., 375 F.2d 629 (5th Cir.), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967). But executive orders may not override contradictory congressional expressions. In the famous challenge to executive power in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), Justice Jackson divided executive orders into three categories: (1) those in which the President acts pursuant to express or implied authorization by Congress, as to which his authority is at a maximum; (2) those in which the President acts in the absence of congressional grant of authority and must rely upon his own independent powers; and (3) those in which executive action conflicts with the express or implied will of Congress and is most vulnerable to challenge.
 
 
 47
 When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system. (footnotes omitted).
 
 
 48
 343 U.S. at 638, 72 S.Ct. at 871. The Third Circuit first validated the Philadelphia Plan as valid executive action and then tested it for conflicts with congressional action, holding that "the Executive is bound by the express prohibitions of Title VII." 442 F.2d at 171-72. The Third Circuit held that the general prohibition against discrimination found in sections 703(a), (h) and (j) did not prohibit the affirmative action imposed by the Philadelphia Plan, given a finding of prior exclusionary practices by the six trade unions controlling the work force.
 
 
 49
 Whether Kaiser has already met its affirmative action burden or not, we are unable to harmonize the more explicit language of section 703(d), which specifically prohibits racial classification in admission to on-the-job training programs, with the affirmative action imposed here. If Executive Order 11246 mandates a racial quota for admission to on-the-job training by Kaiser, in the absence of any prior hiring or promotion discrimination, the executive order must fall before this direct congressional prohibition.
 
 
 50
 We deny appellants relief, not unmindful of the delayed opportunities for advancement this will occasion many minority workers but equally aware of our duty, in enforcing Title VII, to respect the opportunities due to white workers as well. Whatever the merits of racial quotas and the short-term and obvious benefits must not blind us to the seeds of racial animus such affirmative relief undeniably sows[17] Congress has forbidden racial preferences in admission to on-the-job training programs, and under the circumstances of this case we are not empowered by the equitable doctrine of restorative justice to ignore that proscription.
 
 
 51
 AFFIRMED.
 
 WISDOM, Circuit Judge, dissenting:
 
 52
 I respectfully dissent.
 
 
 53
 Today the Court grapples with the question whether, in a collective bargaining agreement, recognition of race for remedial purposes in employment practices is legal "affirmative action" or illegal "reverse discrimination". The majority does not assert race may never be considered in employment practices or in other racially tense areas. Over ten years ago this Court declared, "The Constitution is both color blind and color conscious".[1] Where I differ from the majority is in my assessment of situations justifying reliance on race as a basis for decision-making. Here, the decision-making was by agreement between management and the union, presumably with the blessing of the legislative and executive branches of government but without benefit of the judicial branch. "Management and the government have been our (the unions') partners in these endeavors (to eliminate discriminatory employment practices) and a great deal of credit must be given to them for the accomplishments of the past ten years." Bredhoff, Affirmative Action in a Declining Economy: Seniority and the Incumbent Majority, in Federal Bar Association, An Equal Employment Opportunity Practice Guide, 118, 119 (1977). The third party beneficiaries of these joint endeavors and agreements are the disadvantaged minorities.
 
 
 54
 There are three independent legal justifications for these defendants' actions. I must therefore dissent.
 
 I.
 
 55
 The majority accurately and completely presents the facts of this case. A look at the facts from a different point of view, however, is needed to put the defendants' actions in the proper perspective.
 
 
 56
 This action was brought by a white worker at the Kaiser Aluminum and Chemical Corporation (Kaiser) plant in Gramercy. Gramercy, a town with a population of about 2000, is in St. James Parish, Louisiana, about fifty miles northwest of New Orleans. The Gramercy plant was opened by Kaiser in 1958. Workers at that plant, as in other Kaiser plants, are represented by the United Steelworkers of America (the Union). St. James and the adjacent parishes had a minority population of about 43 percent at the time of trial. The workforce in those parishes was estimated at 39 percent black.[2] At the time of trial the Kaiser workforce at Gramercy was 14.8 percent black. This was a sharp increase from 1969, when, under federal government pressure, Kaiser began hiring at the gate on a one-to-one black to white ratio. At that time the Kaiser workforce was approximately 10 percent black.[3] Before 1969 the plant had hired unskilled labor at the gate by choosing "the most qualified". There was evidence at the trial from two Kaiser personnel officials that Kaiser had never discriminated by race at its Gramercy plant.
 
 
 57
 After the 1969 action, Kaiser was still concerned about the low percentage of black craftsmen at its plant. Prior to 1974 only five of the approximately 290 craftsmen at the plant were black. The company made strenuous but unsuccessful efforts to attract more black craftsmen. Pressure from the federal government continued, not just at the Gramercy plant but nationally. Kaiser and the Union discussed the problem in negotiations leading to their 1974 collective bargaining agreement.
 
 
 58
 Both sides were under pressure in 1974. The company feared federal action through the Office of Federal Contracts Compliance, the agency charged with enforcing Executive Order 11246. Both Kaiser and the Union feared private Title VII actions, by blacks on the basis of crafts employment. The contractual provision set out by the majority resulted. It was incorporated in the national collective bargaining agreement, governing fifteen Kaiser plants across the country. Very similar provisions were included in the Union's contracts with the other two major American aluminum producers, Reynolds Metals and ALCOA.[4]
 
 
 59
 A similar provision was also contained in the national steel producers settlement, approved by this Court in United States v. Allegheny-Ludlum Industries, Inc., 5 Cir. 1975, 517 F.2d 826. The government had investigated racial discrimination by the country's nine major steel producers. The government, the producers, and this same union conducted intensive negotiations. After six months of negotiations, the government filed a pattern and practice suit against the Union and the nine producers. Simultaneously, two consent decrees were filed. The first decree, entered in April 1974, provided:
 
 
 60
 All permanent vacancies in apprenticeships and in entry level jobs in lines of promotion containing occupations which in fact lead to craft jobs, shall be filled on a plant-wide basis from among qualified bidding employees . . . In order to meet the implementing ratio (50 percent), seniority factors shall be applied separately to each group for whom timetables are established and to all other employees.
 
 
 61
 United States v. Allegheny-Ludlum Industries, Inc., Consent Decree I, BNA FEP Manual, 431: 125, 138-39 (1974). Although that decree had not been entered at the time of the agreement in question here, there was testimony that the Kaiser agreement was influenced by the Allegheny-Ludlum negotiations.[5] The Union was a party to both agreements.
 
 II.
 
 62
 The district court rested its decision on two grounds. First, it held that Title VII prohibited completely any privately imposed "quotas". Alternatively, it found this plan illegal because a court would not have imposed it as a remedy in the circumstances this case presents. The majority properly rejects the first ground. As Judge Gee points out, that position would completely contradict the emphasis Congress laid on voluntary conciliation under Title VII. See Albemarle Paper Co. v. Moody, 1975, 422 U.S. 405, 417-18, 95 S.Ct. 2362, 45 L.Ed.2d 280; Alexander v. Gardner-Denver Co., 1974, 415 U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147. The majority, however, accepted the district court's second ground, and agreed that this plan would not have been imposed by a court.[6] The Court accepted that conclusion largely on the strength of the district judge's finding that the defendants had not engaged in discrimination in the past at Gramercy. I believe that the majority has judged the defendants' actions by the wrong standard.[7]
 
 
 63
 The majority's standard produces indirectly what the district court's first ground established directly an end to voluntary compliance with Title VII. The employer and the union are made to walk a high tightrope without a net beneath them. On one side lies the possibility of liability to minorities in private actions, federal pattern and practice suits, and sanctions under Executive Order 11246. On the other side is the threat of private suits by white employees and, potentially, federal action. If the privately imposed remedy is either excessive or inadequate, the defendants are liable. Their good faith in attempting to comply with the law will not save them from liability, including liability for back pay. See Albemarle Paper Co. v. Moody, 1975, 422 U.S. 405, 422-23, 95 S.Ct. 2362, 45 L.Ed.2d 280.
 
 
 64
 Divining the result a court would reach in any litigation is no small problem. In Title VII litigation it is particularly serious, in spite of the earnest efforts of courts, including this Court, to clarify the law. Different courts may apply the law in arguably proper distinct ways. Furthermore, decisions in these cases are fact-sensitive. An employer or a union must not only be sure of the law, but must be confident of what facts will be found. Those problems afflict an employer with a single plant. Kaiser and the Union faced a more difficult situation. They were writing a national contract, covering 15 different plants. Each plant has its own area, its own history. Fifteen separate legal opinions would be required because, under the majority's approach, each plant will be judged on its own facts. To complicate matters further, many companies, including Kaiser, operate in several federal circuits. If the interpretation of Title VII law varies among the circuits, a national agreement is even more difficult.
 
 
 65
 The majority's standard will lead to less voluntary compliance with Title VII. Employers and unions would be liable unless they instituted exactly what a reviewing court felt should have been instituted. They could either bring declaratory judgment actions, or wait to be sued. Under either alternative, our dockets would be filled with more Title VII suits, the Congressional emphasis on voluntary conciliation would be frustrated, and the elimination of the blight of racial discrimination would be still further delayed.
 
 
 66
 In this case of first impression,[8] we should not hold these defendants to so strict a standard. If an affirmative action plan, adopted in a collective bargaining agreement, is a reasonable remedy for an arguable violation of Title VII, it should be upheld. A zone of reasonableness, within which the employer and the union would be sheltered from liability, would encourage private settlements.[9] If this standard were applied to the case before us, we should reverse.
 
 
 67
 In spite of the district court's finding that the defendants had not discriminated against blacks at Gramercy, there were arguable violations. The district court made its finding on the basis of testimony from two Kaiser personnel officials. The defendants were never required to rebut a prima facie case, proved statistically, because the statistics were never analyzed by the district court.[10] The reason for the lack of analysis is clear: no litigant wanted to see past discrimination found. The plaintiffs knew it would weaken their case. Kaiser and the Union could only admit past discrimination by strongly inviting private suits by blacks. Although the trial below was in no way collusive, the defendants could well have realized that a victory at the cost of admitting past discrimination would be a Pyrrhic victory at best. In the district court no one represented the separate interests of the minority employees of Kaiser, the only people potentially interested in showing past discrimination. It is not surprising, therefore, that no party fully analyzed the facts within the context of Title VII. Such an analysis would show three possible or probable violations.
 
 
 68
 First, Kaiser may have discriminated against blacks for unskilled jobs. The evidence showed that although 39 percent of the area workforce was black, only 14.8 percent of Kaiser's employees in 1974 were black. That was an increase from around 10 percent in 1969. The testimony that Kaiser had hired "the best qualified" before 1969 left open the possibilities that Kaiser had determined qualifications through nonvalidated tests,[11] or impermissibly subjective processes.[12] The statistics here constituted a prima facie case of discrimination.[13] The district court did not require and the defendants did not present any evidence in rebuttal. Such discrimination would be linked to this case because in the absence of that discrimination, more blacks could have entered a training program based solely on seniority.[14]
 
 
 69
 Second, the requirement that employees have prior experience in the crafts to enter the limited training program in effect before 1974 may have violated Title VII. Only two of 28 employees trained under that program were black. While there was evidence that each year of a worker's experience saved the company money, no effort was made to present contrary evidence. The judge simply accepted the statement that prior experience was a business necessity validating the requirement in spite of possible differential effects on blacks and whites. The business necessity defense, however, is narrow. The fact that it may be cheaper or more convenient to use a criterion with divergent impact is not enough to justify its use. See Watkins v. Scott Paper Co., 5 Cir. 1976, 530 F.2d 1159, 1168, 1179-83, cert. denied, 1976, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139; United States v. Bethlehem Steel Corp., 2 Cir. 1971, 446 F.2d 652, 662-65; Local 189, United Papermakers and Paperworkers v. United States, 5 Cir. 1969, 416 F.2d 980, 989-91 cert. denied, 1970, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100. See also Jones v. Lee Way Motor Freight, 10 Cir. 1970, 431 F.2d 245, cert. denied, 1971, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237; Pettway v. American Cast Iron Pipe, 5 Cir. 1974, 494 F.2d 211; Buckner v. Goodyear Tire and Rubber, 1972, N.D.Ala., 339 F.Supp. 1108, aff'd without opinion, 5 Cir. 1973, 476 F.2d 1287 (three cases where training programs were tested against the business necessity standard). Cf. E.E.O.C. v. New York Times Broadcasting Service, 6 Cir. 1976, 542 F.2d 356 (prior experience not a valid requirement when the previous employer prevented the discriminatees from acquiring experience).
 
 
 70
 The majority tries to avoid this contention by asserting that the program was "too limited in scope" to be characterized as an unlawful practice. The size of the program may be relevant to the weight to be given the statistics describing it, but the small impact of an action provides no immunity. See McDonald v. Sante Fe Trail Transportation Co., 1976, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (two people); Green v. McDonnell Douglas Corp., 1973, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (one person). If past experience does not satisfy the business necessity requirement, and if more whites than blacks had past experience, then a serious question of Title VII liability is raised even if only one position is at stake.
 
 
 71
 Third, the requirement of any training for some craft jobs may be illegal. While this claim would be the most easily refuted by an employer, no refutation was even attempted. In light of the extremely narrow scope of the business necessity exception, some rebuttal would be necessary.
 
 
 72
 The district judge accepted Kaiser's claims of nondiscrimination. It appears from the record that Kaiser did act in good faith. The company made admirable attempts to recruit black craftsmen, and responded strongly to the problem with its unskilled labor force in 1969. Good faith, however, is not a defense to Title VII. Although the three potential violations discussed above may not make the district court's finding "clearly erroneous" in the sense contemplated by Rule 52(a), F.R.Civ.P., arguable violations clearly existed.
 
 
 73
 To immunize this plan the defendants should also be required to show that the plan is a reasonable remedy. The similar provisions required by courts in Title VII litigation demonstrate that this relief can be reasonable. See, e. g., Rios v. Enterprise Association Steamfitters Local 638, 2 Cir. 1974, 501 F.2d 622; United States v. Ironworkers Local 86, 9 Cir. 1971, 443 F.2d 544, cert. denied, 1971, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367; Buckner v. Goodyear Tire and Rubber Co., 1972, N.D.Ala., 339 F.Supp. 1108, aff'd without opinion, 5 Cir., 476 F.2d 1287. Cf. Southern Illinois Builders Association v. Ogilvie, 7 Cir. 1972, 471 F.2d 680, upholding a similar program under the Executive Order and United States v. Allegheny-Ludlum Industries, Inc., 5 Cir. 1975, 517 F.2d 826, upholding a similar program as part of a consent decree. Three other factors add weight to that conclusion.
 
 
 74
 First, the plan was negotiated by the employer and the union. The privileges which federal law grants a union as the representative of the covered workers carry with them the duty to represent in good faith the interests of all the workers. See Steele v. Louisville & N. Rwy. Co., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (Railway Labor Act); Ford Motor Co. v. Huffman, 1953, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048; Humphrey v. Moore, 1964, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370; Vaca v. Sipes, 1967, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842. An affirmative action plan should be less suspect when negotiated between employer and union. The union's duty to represent white workers, who may often be, as here, a majority of the bargaining unit, serves as a check on the fairness of the plan.[15]
 
 
 75
 Second, the kind of relief given reduced the impact on white workers. Our Court and the Supreme Court have adopted the "rightful place" theory for remedying discrimination. See International Brotherhood of Teamsters v. United States, 1977, 431 U.S. 324, 371-77, 97 S.Ct. 1843, 1873-75, 52 L.Ed.2d 396, 437-441; Local 189, United Papermakers and Paperworkers v. United States, 5 Cir. 1969, 416 F.2d 980, cert. denied, 1970, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100; Gamble v. Birmingham Southern R.R. Co., 5 Cir. 1975, 514 F.2d 678, 683; Bing v. Roadway Express, Inc., 5 Cir. 1973, 485 F.2d 441. Other circuits also adopted the rightful place theory as a fair solution. See, e. g., United States v. Navajo Freight Lines, 9 Cir. 1975, 525 F.2d 1318; Reed v. Arlington Hotel Co., 8 Cir. 1973, 476 F.2d 721, cert. denied, 1973, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (remedy must consider the interests of both groups); United States v. Bethlehem Steel Corp., 2 Cir. 1971, 446 F.2d 652, 659.
 
 
 76
 The rightful place remedy was originally seen as a compromise among three competing theories: "freedom now", "rightful place", and "status quo". Local 189, 416 F.2d at 988. The "freedom now" remedy would have displaced white workers in an effort to eliminate completely the effects of past discrimination. The "status quo" remedy would protect all the expectations acquired by white workers. The "rightful place" theory did not attempt to displace white workers, but required that any future actions be untainted by past discrimination. Since that time, some judges have expressed reservations about ordering relief which put too great a burden on white employees to assist blacks: "robbing Peter to pay Paul". Franks v. Bowman Transportation Co., 1976, 424 U.S. 747, 781, 96 S.Ct. 1251, 47 L.Ed.2d 444 (Burger, C. J., dissenting). See id., 424 U.S. at 787-91, 96 S.Ct. 1251 (Powell, J., dissenting and concurring). The most prominent recent cases where a court refused to order a "quota" remedy involved lay-offs, when such a quota would have meant that whites would have lost their jobs in deference to less senior blacks. See Chance v. Board of Examiners, 2 Cir. 1976, 534 F.2d 993, cert. denied, 1977, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060; Watkins v. United Steelworkers of America, 5 Cir. 1975, 516 F.2d 41; Jersey Central Power & Light Co. v. IBEW, 3 Cir. 1975, 508 F.2d 687, vacated and remanded, 1976, 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812, on remand, 3 Cir., 542 F.2d 8; Waters v. Wisconsin Steel Works, 7 Cir. 1974, 502 F.2d 1309, cert. denied, 1976, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823; Anderson v. San Francisco School District, 1972, N.D.Cal., 357 F.Supp. 248; cf. Kirkland v. New York State Dept. of Correctional Services, 2 Cir. 1975, 520 F.2d 420 (quotas should not be imposed when identifiable white "victims" of the remedy exist).
 
 
 77
 In the instant case entirely new rights were created by the plan. None of the white or black employees affected by this proposal had any chance to receive craft training from Kaiser before the 1974 Agreement. Only those workers with prior experience had been eligible for training, and that pool had been exhausted. No white workers lost their jobs, none had expectations disappointed. Instead, the defendants created entirely new expectations in all the employees, without harming the chances of any Kaiser employee for such training.
 
 
 78
 Finally, the plan is reasonable because it allows significant white participation. Although the fastest way to remedy past discrimination would have been to institute a training program just for blacks,[16] the Agreement provides that 50 percent of the workers trained will be white. Every Kaiser employee can benefit from the program. It is true that black employees receive more than their white colleagues, but the black employees arguably faced racial discrimination at Kaiser's hands the white workers did not. This white participation makes the plan more reasonable. See Carter v. Gallagher, 8 Cir. 1972, 452 F.2d 315 (en banc), cert. denied, 1972, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338; United States v. N. L. Industries, 8 Cir. 1973, 479 F.2d 354; Patterson v. Newspaper Deliverers' Union, 2 Cir. 1975, 514 F.2d 767, 773, 775, cert. denied, 1976, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203.
 
 
 79
 Thus, the 1974 Agreement was a reasonable response to the situation. The defendants were faced with arguable violations of Title VII, federal government pressure, and the impending steel industry settlement. They created an affirmative action plan which aided all Kaiser employees while particularly assisting minority group members. We should not upset their efforts.[17]
 
 III.
 
 80
 The defendants' actions may also be upheld as a proper response to societal discrimination against blacks. The majority avoids the merits of this contention.
 
 
 81
 The Court does not deny that discrimination by craft unions may have had a major effect on the number of black craftsmen. The majority, however, focuses on the question of seniority. Those affected by the claimed discrimination are now unskilled workers. Because of the lower court's determination that there was no discrimination at Kaiser's Gramercy plant, those unskilled workers have a seniority status which is unaffected by past discrimination. The majority then concludes that past discrimination cannot justify modification of this untainted seniority system to produce the job training ratios used."Where admissions to the craft on-the-job training programs are admittedly and purely functions of seniority and that seniority is untainted by prior discriminatory acts, the one-for-one ratio, whether designed by agreement between Kaiser and USWA or by order of court, has no foundation in restorative justice, and its preference for training minority workers thus violates Title VII."
 
 
 82
 The majority's error is in its last step. It connects the ratio with a change in the seniority system, but that misses the point. Seniority was the system voluntarily adopted by the defendants to allocate scarce opportunities within the black and white employee groups created by this plan. Although seniority is a major tool in modern labor relations, it is a voluntary tool. Unions and employers may agree on other methods of allocation. If, for example, the training program had provided that training opportunities would be divided among able black and white workers by two separate lotteries, the majority's error would be clear. Although the past discrimination against blacks would not in any way affect their lottery numbers, that would have no implications for the validity of the program. The program stands or falls on its separation of workers into two racial pools for assignment to job training. The way that workers are then selected from within those pools is irrelevant. Admissions were not "admittedly and purely functions of seniority", they were functions of race first, then seniority. No other situation existed before 1974, because there was no such training program before the 1974 Agreement. The only training program that existed then made admission a function of experience, not seniority. The Court cannot avoid the merits of the defendants' assertion societal discrimination justifies this plan.
 
 
 83
 Therefore, I am forced to confront directly the relationship between societal discrimination and Title VII. This is best dealt with by considering two subsidiary questions: May employers compensate employees for societal discrimination, and may race be used as a sign of societal discrimination?
 
 
 84
 Although the first question does not appear to have been passed upon in the courts, the answer should be "yes". While the government might not be able to require that restorative justice be done, neither should it prevent it. Title VII prohibits only discrimination by race, sex, religion, or national origin. In other respects the discretion of the employe remains. There should be no objection to an employer preferring, for whatever reasons, employees who have faced discrimination. See majority opinion at 224-225.
 
 
 85
 The second question is more difficult. If employers may assist those victimized by past discrimination, may they use race as a proxy for the existence of such discrimination? A broad acceptance of that proposition could have drastic effects. Most of the ethnic groups represented in this country have been discriminated against at one time or another. If Americans of Irish, Italian, Jewish, or German extraction were allowed employment preferences as compensation for undoubted past societal discrimination, Title VII would be eviscerated.
 
 
 86
 Yet a negative answer to that question would also have serious implications. Acknowledged and damaging past discrimination would be without a private remedy in employment training. Unless a member of a minority group could show explicit discrimination, the laws that forbid future discrimination by employers would also forbid corrective action for past discrimination by others. If a large number of the people involved are not able to show this specific discrimination, then the group will be caught in the cycle caused by discrimination. The future laps of the race will be of equal length, but blacks, Latin-Americans, Asian-Americans, and women will have to start behind the other competitors.
 
 
 87
 In the present case the problem is clear. The history of discrimination in the trades is a sorry record of continual exclusion of women and minorities.[18] Yet how many of the excluded workers could prove that they had applied for and been refused crafts jobs or training? How many have been deterred by the knowledge of their exclusion from even attempting to find crafts jobs? In some circumstances it is possible to determine whether a particular person has been harmed by discrimination, and to provide relief to that person. Here we know the discrimination existed, statistics show that it was effective, but it is difficult to identify individual victims. That situation would prevail against Title VII suits directly against the discriminating unions or in situations similar to the one this case presents, where third parties seek to compensate for the discrimination. The result would be a wrong without a remedy.
 
 
 88
 Some measures to compensate for past discrimination are provided by law currently. The federal government provides by statute a number of preferences for minorities.[19] Closer to this case, employment discrimination law itself imposes requirements on employers which can be viewed only as compensation for racial isolation and its effects. Thus, Title VII's requirement that employment tests must be validated does not require a finding that the employer chose the tests to produce discrimination, nor a finding that the employer produced the conditions that caused lower minority scores on the tests. Instead, it rests on a Congressional purpose not to allow the effects of past discrimination to affect employment decisions when those effects are not job-validated. Similarly, special recruiting efforts aimed at minority groups, often imposed under affirmative action programs,[20] are not conditioned on a showing that the employer intentionally selected the "white" media for recruiting. Instead, it is an effort to compensate for the isolation of minority groups from the mainstream of society, caused at least in part by past discrimination.
 
 
 89
 This dissent is not the place to explore the contours of a societal discrimination justification for employment or training preferences. However, when the discrimination is as egregious and recent as that against blacks in the crafts, a reasonable preference in training programs should be upheld.
 
 IV.
 
 90
 A third ground for upholding the defendants' actions is that their program was required by Executive Order 11246, 30 Fed.Reg. 12319. This Executive Order requires federal contractors to take affirmative action to prevent low employment of women and minorities in their workforces, starting from the assumption that most disproportionately low employment is the result of discrimination if not of the contractor involved, then of someone else. I disagree with the majority's view that if the Executive Order purports to legalize this program, the Executive Order is invalid. I believe, however, that the district court would have to determine whether this plan does in fact comport with the requirements of the Executive Order. Therefore, on this ground I would remand the case to the district court for further proceedings.
 
 
 91
 I do not disagree with the majority's conclusion that if a conflict between the Executive Order and Title VII exists, it should be resolved in favor of Title VII. But that weighty question of the allocation of power between the legislative and the executive branches of government need not be reached. Here, the two are not in conflict.
 
 
 92
 As the majority points out, affirmative action plans under the Executive Order have been held constitutional. See E.E.O.C. v. A.T. & T., 3 Cir. 1977, 556 F.2d 167, aff'g, 1976, E.D.Pa., 419 F.Supp. 1022; Contractors Association of Eastern Pennsylvania v. Secretary of Labor, 3 Cir. 1971, 442 F.2d 159; Southern Illinois Builders Association v. Ogilvie, 7 Cir. 1972, 471 F.2d 680; Mele v. Department of Justice, 1975, D.N.J., 395 F.Supp. 592, aff'd without opinion, 3 Cir. 1976, 532 F.2d 747. Cf. Associated General Contractors of Massachusetts v. Altshuler, 1 Cir. 1973, 490 F.2d 9, cert. denied, 1974, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307; Joyce v. McCrane, 1970, D.N.J., 320 F.Supp. 1184; Weiner v. Cuyahoga Community College, 1968, Ohio Ct. of Appeals, aff'd mem., 1969, 19 Ohio St.2d 35, 249 N.E.2d 907, cert. denied, 1969, 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (similar state plans). For a history of the Executive Order and the response to it in Congress and the courts, see Comment, The Philadelphia Plan: A Study in the Dynamics of Executive Power, 39 U.Chi.L.Rev. 752 (1972).
 
 
 93
 The majority seeks to distinguish Contractors Ass'n of Eastern Pennsylvania by stressing the finding there that discrimination had existed in the industry. It should be noted that the parties involved in that case were the contractors; the groups discriminating were the crafts unions. The opinion is in fact directly in point in that respect because it involved actions of the non-discriminating parties.[21]
 
 
 94
 The legal situation has changed significantly since that opinion. Congress has implicitly exempted the Executive Order from the constraints of Title VII.[22] See Comment, The Philadelphia Plan: A Study in the Dynamics of Executive Power, 39 U.Chi.L.Rev. 723, 751-57 (1972). Congress did so through three actions taken during consideration of the Equal Employment Opportunity Act of 1972, Pub.L. 92-261. At that time the regulations requiring affirmative action in the form of goals and timetables had been in effect for several years. The "Philadelphia Plan", the subject of the Association Contractors decision, had been in effect for three years.
 
 
 95
 The legislation originally presented would have transferred the entire Executive Order enforcement program to the E.E.O.C. Congress eliminated that provision by an amendment offered by Senator Saxbe. In support of the amendment, the Senator stated:
 
 
 96
 It has been the "goals and timetables" approach which is unique to the OFCC's efforts in equal employment, coupled with extensive reporting and monitoring procedures that has given the promise of equal employment opportunity a new credibility.
 
 
 97
 The Executive Order program should not be confused with the judicial remedies for proven discrimination which unfold on a limited and expensive case-by-case basis. Rather, affirmative action means that all Government contractors must develop programs to insure that all share equally in the jobs generated by the Federal Government's spending. Proof of overt discrimination is not required.
 
 
 98
 118 Cong.Rec. 1385 (1972). Another amendment which would have had substantially the same result as the original language was rejected by Congress. 118 Cong.Rec. 3367-70, 3371-73, 3959-65 (1972).
 
 
 99
 The most telling action was the rejection by the Senate of an amendment to § 703(j) of Title VII, offered by Senator Ervin. The Ervin amendment would have extended that section to read:
 
 
 100
 Nothing contained in this title or in Executive Order No. 11246, or in any other law or Executive Order, shall be interpreted to require any employer . . . to grant preferential treatment to any individual. . . . (Emphasis added.)
 
 
 101
 118 Cong.Rec. 1676 (1972). This amendment was viewed and debated as an attack on Philadelphia-type plans. See 118 Cong.Rec. 1664-65 (1972) (Sen. Javits).[23]
 
 
 102
 Finally, the section-by-section analysis of the amendments undertaken by the Senate Subcommittee on Labor provided:
 
 
 103
 In any area where the new law does not address itself, or in any areas where a specific contrary intent is not indicated, it was assumed that the present case law as developed by the courts would continue to govern the applicability and construction of Title VII.
 
 
 104
 Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, Legislative History of Equal Employment Opportunity Act of 1972 at 1844 (1972). With the decision in Contractors Association before it, there can be little question that whatever the status of that opinion before 1972, Congress ratified the Philadelphia Plan as consistent with Title VII.
 
 
 105
 The district court did not pass upon the validity and applicability of the Executive Order. There is a question whether Kaiser's extensive recruiting efforts before 1974 completely satisfied the requirements of the Executive Order. See 41 C.F.R. § 60-2.1 et seq. Furthermore, the regulations promulgated under the Executive Order disclaim any intent to impose a "quota". 41 C.F.R. § 60-2.30. If the majority is right about the effect of Title VII on this litigation, apart from considerations of the Executive Order, then the disavowal in the regulations of quotas might be read in the same way. Those questions require the consideration of the trial court. Therefore, if I accepted the majority's position that Title VII, apart from the Executive Order, prohibited the conduct in question, I would still vacate the decision and remand it for further proceedings.[24]
 
 V.
 
 106
 "Reverse discrimination" is a question of great current concern. It has spawned an extensive literature, and caused heated debates, some between former allies.[25] It is a troubling question. The color blind constitution, so eloquently invoked by the first Justice Harlan, has great appeal. A person's color should not be relevant to most decisions. This Court knows that acceptance of that principle did not come easily. At this stage in the history of eliminating racial discrimination, the use of a racial criterion because it is "benign" pulls us perilously close to self-contradiction. But in spite of our newly adopted equality, the pervasive effects of centuries of societal discrimination still haunt us. Kaiser and the United Steelworkers sought in a reasonable manner to remedy some of those effects in employment practices. Their actions may or may not be just to all its employees; they may or may not be wise; but I believe they are legal. Therefore, I respectfully dissent.
 
 
 
 [1]
 The dual lists were maintained solely for eligibility to on-the-job training, and all other seniority benefits were conferred without regard to race
 
 
 [2]
 Amicus briefs on behalf of Kaiser and USWA were filed by Reynolds Metal Company, the United States and the Equal Employment Opportunity Commission, and Aluminum Company of America (ALCOA). Great Plains Legal Foundation, the Southeastern Legal Foundation and the Anti-Defamation League of B'nai B'rith filed amicus briefs supporting appellee Weber
 
 
 [3]
 Executive Order No. 11246 requires all applicants for federal contracts to refrain from employment discrimination and to "take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin." § 202(1), 3 C.F.R. 169 (1974), reprinted following 42 U.S.C. § 2000e (1970). The Executive Order empowers the Secretary of Labor to issue rules and regulations necessary and appropriate to achieve its purpose. He, in turn, has delegated most enforcement duties to the OFCC. See 41 C.F.R. 60-20.1 et seq.; 41 C.F.R. 60-2.24
 
 
 [4]
 (a) It shall be an unlawful employment practice for an employer
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
 42 U.S.C. § 2000e-2(a) (1970).
 
 
 [5]
 (j) Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area
 42 U.S.C. § 2000e-2(j) (1970).
 
 
 [6]
 See United Jewish Organizations of Williamsburgh, Inc. v. Carey, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (does redistricting to assure a black majority illegally dilute the voting strength of Hasidic Jews?); Franks v. Bowman Transp. Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) (does the grant of fictional seniority to identifiable victims of employment discrimination illegally discriminate against the seniority rights of nonminority employees?); Bakke v. Regents of University of California, 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976), cert. granted, 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 (1977) (does reservation of a certain number of "black" places in the entering class of a state medical school impermissibly discriminate against better-qualified white students who would have been admitted but for the racial quota?); Chance v. Board of Examiners and Board of Education of New York, 534 F.2d 993 (2d Cir. 1976), cert. denied, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977) (does a quota which requires the percentage of black and Puerto Rican supervisors to reflect the surrounding population discriminate by forcing the dismissal of whites with greater seniority?)
 
 
 [7]
 Albemarle Paper Co. v. Moody, 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)
 
 
 [8]
 This duty is analogous to the equitable duty to eliminate the continuing effects of past discrimination in voting rights, United Jewish Org. of Williamsburgh, Inc. v. Carey, supra; Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965), or to the courts' equitable power to correct continued inequities resulting from intentional segregation of schools. Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)
 
 
 [9]
 For a discussion of the "rightful-place" doctrine, see Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969)
 
 
 [10]
 While serving in the Labor Department, I helped devise minority employment goals for government contractors
 I now realize that the distinction we saw between goals and timetables on the one hand, and unconstitutional quotas on the other, was not valid. Our use of numerical standards in pursuit of equal opportunity has led ineluctably to the very quotas, guaranteeing equal results, that we wished to avoid.
 Silberman, The Road to Racial Quotas, Wall St. J., Aug. 11, 1977, at 12, col. 4.
 
 
 [11]
 Mr. Dennis E. English, Kaiser's Industrial Relations Superintendent at the Gramercy plant, testified that the great majority of all employees at this plant were hired from the adjacent parishes of St. James and St. John the Baptist. According to census figures, approximately forty percent of the total population of these Parishes are members of minority groups
 Weber v. Kaiser Aluminum Corp., 415 F.Supp. 761, 764 (E.D.La.1976).
 
 
 [12]
 The most important and obvious distinction is the fact that Sections 703(a) and (d) of Title VII do not prohibit the courts from discriminating against individual employees by establishing quota systems where appropriate. The proscriptions of the statute are directed solely to employers
 
 
 [415]
 F.Supp. at 767
 
 
 [13]
 Appellants argued that because prior craft experience was formerly required for admittance to on-the-job training and because minorities lacked such experience due to the discriminatory nature of craft unions, indeed there had been some prior discrimination at the Gramercy plant. But only 28 employees were elevated to craft positions through this training program in the ten years prior to 1974; two of these were black. We conclude that this program was so limited in scope that the prior craft experience requirement cannot be characterized as an unlawful employment practice, especially when Kaiser was actively recruiting blacks to its craft families during the same period. That only three black crafts workers were hired from outside the plant reflects the general lack of skills among available blacks but does not reflect any unlawful practice by Kaiser
 
 
 [14]
 Griggs v. Duke Power Co., 401 U.S. 424, 430-31, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)
 
 
 [15]
 Although ability to perform and physical fitness are factors to be considered in addition to seniority in admitting employees to on-the-job training, the amicus brief of the Equal Employment Opportunity Commission asserts that there was no evidence and no suggestion that any unsuccessful white bidder had greater ability or was more physically fit than the successful black bidders
 
 
 [16]
 Seniority systems and the entitlements conferred by credits earned thereunder are of vast and increasing importance in the economic employment system of this Nation. S. Slichter, J. Healy & E. Livernash, The Impact of Collective Bargaining on Management, 104-115 (1960). Seniority principles are increasingly used to allocate entitlements to scarce benefits among competing employees ("competitive status" seniority) and to compute noncompetitive benefits earned under the contract of employment ("benefit" seniority). Ibid. We have already said about "competitive status" seniority that it "has become of overriding importance, and one of its major functions is to determine who gets or who keeps an available job." Humphrey v. Moore, 375 U.S. 335, 346-347, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964)
 Franks v. Bowman Transp. Co., 424 U.S. at 765, 96 S.Ct. at 1265.
 
 
 [17]
 Racial quotas also have been criticized for contributing to the Balkanization of this country by fostering "the dangerous notion that ethnic, racial or religious groups are entitled to proportional representation in all occupations."
 In hindsight, one can see this was predictable. We wished to create a generalized, firm, but gentle pressure to balance the residue of discrimination. Unfortunately, the pressure numerical standards generate cannot be generalized or gentle; it inevitably causes injustice.
 Silberman, supra at col. 5.
 
 
 [1]
 United States v. Jefferson County School Board, 5 Cir. 1966, 372 F.2d 836, 876, aff'd on rehearing en banc, 380 F.2d 385, cert. denied sub nom. Caddo Parish School Board v. United States, 1967, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103. Continuing, we said: "To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must not be based on race. In that sense the Constitution is color blind. But the Constitution is color conscious to prevent discrimination being perpetuated and to undo the effects of past discrimination." 380 F.2d at 385
 
 
 [2]
 The plan in question applied to blacks, other minority groups, and women. However, at Gramercy its application thus far has involved only blacks. For convenience, I use the term "blacks" both in the specific Gramercy situation and in other situations, when a more complete statement would include the other affected groups
 
 
 [3]
 The record shows that the Gramercy plant has experienced an increase in black employment of about one percent of their total workforce per year since 1969. Although there was no direct evidence about the percentage of black employees in 1969, extrapolation from those figures produces an estimate that about 10 percent of the Kaiser workforce at Gramercy was black in 1969. Appendix at 123-24, 129-30, 137
 
 
 [4]
 Both companies entered this action as amici curiae, asserting an interest in the litigation because collective bargaining agreements to which they are parties contain similar provisions. ALCOA Brief at 1, Reynolds Brief at 1
 
 
 [5]
 See Appendix at 152 (Thomas Bowdle, Kaiser's Director of Equal Opportunity Affairs), 131 (Dennis English, Industrial Relations Supervisor at Gramercy)
 
 
 [6]
 The majority opinion leaves in question the status of consent decrees. These decrees, like the one approved by this Court two years ago in Allegheny-Ludlum, may be entered without extensive fact-finding by the district court. If consent decrees are immune from the majority's test, friendly suits would offer employers an easy way to circumvent the holding of this opinion. If they are not immune, the district court, before accepting the consent decree, will be forced to determine the existence and extent of past discrimination by the defendants
 
 
 [7]
 For reasons detailed below, at 221-222, I believe that the district court's finding that there was no prior discrimination at the Gramercy plant is highly questionable. Even under the majority's standard, the district court must be reversed if that finding is clearly erroneous. Rule 52(a) F.R.Civ.P. My disagreement with the standard the majority applies makes it unnecessary to determine whether this finding falls within Rule 52(a)
 
 
 [8]
 The Supreme Court expressly reserved the question of the validity of "affirmative action programs" when it held that Title VII applied to white male workers. McDonald v. Santa Fe Trail Transportation Co., 1976, 427 U.S. 273, 281 n. 8, 96 S.Ct. 2574, 49 L.Ed.2d 493. The Courts of Appeals have considered and rejected "quotas" in some cases where such relief was sought in the district courts. See, e. g., Chance v. Board of Examiners, 2 Cir. 1976, 534 F.2d 993, cert. denied, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060; Watkins v. United Steelworkers of America, 5 Cir. 1975, 516 F.2d 41; Waters v. Wisconsin Steel Works, 7 Cir. 1974, 502 F.2d 1309, cert. denied, 1976, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823. Several lower courts have considered voluntarily instituted preferential hiring in light of Title VII. See Cramer v. Va. Commonwealth University, 1976, E.D.Va., 415 F.Supp. 673; Reeves v. Eaves, 1976, N.D.Ga., 411 F.Supp. 531. Cf. Anderson v. San Francisco School Unified District, 1972, N.D.Cal., 357 F.Supp. 248 (not governed by Title VII); Flanagan v. Georgetown University, 1976, D.D.C., 417 F.Supp. 377 (distribution of scholarship funds, governed by Title VI)
 The Supreme Court has held that race may "be considered in formulating a remedy" (North Carolina State Board of Education v. Swann, 1971, 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586); in devising remedies, seniority credits for past discrimination (Franks v. Bowman Transportation Co., 1976, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444); in carrying out a prophylactic program to prevent racially disadvantageous outcomes, whether or not they violate the Constitution (United Jewish Organizations of Williamsburgh, Inc. v. Carey, 1977, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229); in avoiding racially disproportionate effects of employment testing practices (Albemarle Paper Co. v. Moody, 1975, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280).
 
 
 [9]
 We need not consider in this case the validity of a settlement if actual, as opposed to arguable, discrimination is found by a reviewing court. Even if such a settlement were given no effect, voluntary compliance would be encouraged because the employer would be protected from suits from at least one side
 
 
 [10]
 Usually, a statistical showing of a significant discrepancy between the percentage of minority group members employed and the percentage of the minority group members in the relevant labor market is sufficient to make a prima facie case for a violation. See International Brotherhood of Teamsters v. United States, 1977, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396; Wade v. Mississippi Cooperative Extension Service, 5 Cir. 1976, 528 F.2d 508, 516-17; United States v. Hayes International Corp., 5 Cir. 1972, 456 F.2d 112, 120. See also Hazelwood School District v. United States, 1977, --- U.S. ----, ---- - ----, 97 S.Ct. 2736, 2741-2744, 53 L.Ed.2d 768, 777-80; Dothard v. Rawlinson, 1977, --- U.S. ----, ---- - ----, 97 S.Ct. 2720, 2726-2728, 53 L.Ed.2d 786, 797-98
 
 
 [11]
 See 42 U.S.C. § 2000e-2(h) (1970); Griggs v. Duke Power Co., 1971, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158; Albemarle Paper Co. v. Moody, 1975, 422 U.S. 405, 425-36, 95 S.Ct. 2362, 45 L.Ed.2d 280; James v. Stockham Valves & Fittings Co., 5 Cir. 1977, 559 F.2d 310, 334-40; Pettway v. American Cast Iron Pipe Co., 5 Cir. 1974, 494 F.2d 211, 221
 
 
 [12]
 See James v. Stockham Valves & Fittings Co., 5 Cir. 1977, 559 F.2d 310, 345-47; Bolton v. Murray Envelope Co., 5 Cir. 1974, 493 F.2d 191, 195; Rowe v. General Motors Corp., 5 Cir. 1972, 457 F.2d 348, 359; United States v. Jacksonville Terminal Co., 5 Cir. 1971, 451 F.2d 418, 442, cert. denied, 1972, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815
 
 
 [13]
 Compare Dothard v. Rawlinson, 1977, --- U.S. ----, ----, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786, 797 (relevant labor market 36.89 percent female, employees only 12.9 percent female establishes prima facie case)
 
 
 [14]
 Compare this with the majority's ground for rejecting societal discrimination as a justification for this program, supra at pp. 225-226
 
 
 [15]
 The Union's influence can be seen in the provisions which give white employees a significant share of these new opportunities. One of the Union's major goals was to provide more advancement opportunities for Kaiser employees in place of workers hired off the street. Appendix at 152
 The Union's duty to bargain in good faith for all its members does not prevent it from fairly advancing the national policy against discrimination, even if that requires assisting some of its members more than others.
 Certainly there is no argument that the award of retroactive seniority to the victims of hiring discrimination in any way deprives other employees of indefeasibly vested rights conferred by the employment contract. This Court has long held that employee expectations arising from a seniority system agreement may be modified by statutes furthering a strong public policy interest . . . The Court has also held that a collective bargaining agreement may go further, enhancing seniority status of certain employees for purposes of furthering public policy interests beyond what is required by statute, even though this will to some extent be detrimental to the expectations acquired by other employees under the previous seniority agreement . . . And the ability of the union and employer voluntarily to modify the seniority system to the end of ameliorating the effects of past racial discrimination, a national policy objective of "the highest priority"; is certainly no less than in other areas of public policy interests.
 Franks v. Bowman Transportation Co., 1976, 424 U.S. 747, 778-79, 96 S.Ct. 1251, 1271, 47 L.Ed.2d 444, 469-70.
 
 
 [16]
 A program of pre-training preparation exclusively for blacks was approved by this Court in Buckner v. Goodyear Tire and Rubber Co., 5 Cir. 1973, 476 F.2d 1287, aff'g without opinion, 1972, N.D.Ala., 339 F.Supp. 1108. In a dissenting opinion strenuously attacking the use of quota remedies, Judge Hayes of the Second Circuit stated that training programs exclusively for blacks were legitimate affirmative action. Rios v. Enterprise Ass'n Steamfitters Local 638, 2 Cir. 1974, 501 F.2d 622, 637
 
 
 [17]
 One advantage of the standard I propose is that it takes the reasonableness of the remedy into consideration. The majority is concerned mainly with the existence of past discrimination. Once such discrimination is found, the only question appears to be whether a district court could have imposed such a remedy. A district court's remedial authority in Title VII is extremely broad
 "The provisions of this subsection (§ 706(g)) are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible."
 
 
 [118]
 Cong.Rec. 7168 (1972), Section-by-Section Analysis of Equal Employment Opportunity Act of 1972. The standard proposed in this dissent would limit private parties more than § 706(g) limits the judiciary by requiring that the remedy be "reasonable"
 
 
 [18]
 Judicial findings on discrimination in crafts are so common as to make it a proper subject for judicial notice. See, e. g., United States v. International Union of Elevator Constructors, 3 Cir. 1976, 538 F.2d 1012; Associated General Contractors of Massachusetts v. Altshuler, 1 Cir. 1973, 490 F.2d 9, cert. denied, 1974, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307; United States v. Wood, Wire and Metal Lathers, 2 Cir. 1973, 471 F.2d 408, cert. denied, 1973, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398; Southern Illinois Builders Association v. Ogilvie, 7 Cir. 1972, 471 F.2d 680; Contractors Association of Eastern Pennsylvania v. Secretary of Labor, 3 Cir. 1971, 442 F.2d 159; cert. denied, 1971, 404 U.S. 854, 92 S.Ct. 447, 30 L.Ed.2d 367; Local 53 of International Association of Heat & Frost, etc. v. Vogler, 5 Cir. 1969, 407 F.2d 1047; Buckner v. Goodyear, 1972, N.D.Ala., 339 F.Supp. 1108, aff'd without opinion, 5 Cir. 1973, 476 F.2d 1287
 The "home town plans", favored by recent Secretaries of Labor as an alternative to the Philadelphia-type plans, have not brought a great improvement. N. Y. Times, October 16, 1977 § 4, at 2, Col. 4.
 
 
 [19]
 See Brief of the United States as Amicus Curiae, Regents of the University of California v. Bakke, U.S. No. 76-811 (argued Oct. 12, 1977), Appendix A. These programs may be of doubtful constitutionality pending the outcome of Bakke
 
 
 [20]
 See 41 C.F.R. § 60-2.24(e) (1976)
 
 
 [21]
 The plaintiffs in that case were a contractors' association and several intervening contractors. The unions, against whom the findings of exclusionary practices was lodged, participated only as amici. Thus, the contractors were in the same position that Kaiser finds itself in here
 
 
 [22]
 The predecessor of this Executive Order was mentioned in the 1964 Act in a section dealing with necessary reports, § 709(d), 42 U.S.C. § 2000e-8(d) (1970). It could be argued that the Order was protected by § 1103, 42 U.S.C. § 2000h-3 (1970), which is a saving clause for then existing authority for federal action
 It could also be argued that the rejection in 1969 of the so-called Fannin Rider demonstrated Congressional approval of the Executive Order. The Comptroller General had declared the Philadelphia Plan illegal on the ground that it lacked standards needed to comply with rules regulating competitive bidding. Senator Fannin introduced a rider to an appropriations bill which would have denied all funds for any contracts held illegal by the Comptroller General. The debate made clear that the Philadelphia Plan was the target of the Rider. See Comment, The Philadelphia Plan, supra, 747-50.
 
 
 [23]
 Senator Javits made clear the connection between the Philadelphia Plan and the Ervin Amendment:
 "First, it would undercut the whole concept of affirmative action as developed under Executive Order 11246 and thus preclude Philadelphia-type plans."
 
 
 [118]
 Cong.Rec. 1665 (1972). The Contractors Association decision, which upheld the Philadelphia Plan, was printed in the Congressional Record at Senator Javit's request
 
 
 [24]
 If, on remand, the district court were to conclude that the Executive Order was not violated by this plan, then a constitutional question might arise about the validity of this federal action. Of course, I express no opinion on the merits of that constitutional question. See United Jewish Organizations of Williamsburgh v. Carey, 1977, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229; Califano v. Webster, 1977, 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360; Bakke v. Regents of the University of California, 1976, 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152, awaiting decision, U.S., No. 76-811 (Argued October 12, 1977)
 
 
 [25]
 Among the more interesting treatments of this question are R. Dworkin, Taking Rights Seriously 223-39 (1977); N. Glazer, Affirmative Discrimination (1976); Brest, Foreword: In Defense of the Antidiscrimination Principle, 90 Harv.L.Rev. 1 (1976); Ely, The Constitutionality of Reverse Racial Discrimination, 41 U.Chi.L.Rev. 723 (1974); Fiss, Groups and the Equal Protection Clause, 5 J.Phil. & Pub.Aff. 107 (1976); Fiss, A Theory of Fair Employment Laws, 38 U.Chi.L.Rev. 235 (1971); Kaplan, Equal Justice in an Unequal World: Equality for the Negro The Problem of Special Treatment, 61 Nw.L.Rev. 363 (1966)