596 F.2d 809
 19 Fair Empl.Prac.Cas. 818, 19 Empl. Prac.
Dec. P 9189
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Appellee,
v.
CONTOUR CHAIR LOUNGE COMPANY, INC., Appellant.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Appellant,
v.
CONTOUR CHAIR LOUNGE COMPANY, INC., Appellee.
 Nos. 78-1843, 78-1869.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 19, 1979.
Decided April 24, 1979.
Rehearing and Rehearing En Banc Denied May 15, 1979.
 
 William Sitzer of Dubail, Judge, Kilker & Maier, St. Louis, Mo., for appellant Contour Chair Lounge Co., Inc.
 Leopoldo Fraga, Jr. of Equal Employment Opportunity Commission, Appellate Div., Washington, D. C., for appellee EEOC; Issie L. Jenkins, Acting Gen. Counsel, Joseph T. Eddins, Jr., Associate Gen. Counsel, Beatrice Rosenberg, Asst. Gen. Counsel, Washington, D. C., on brief.
 Before ROSS, STEPHENSON and HENLEY, Circuit Judges.
 HENLEY, Circuit Judge.
 
 
 1
 This case involves alleged racial discrimination in employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e Et seq. The case comes to us from the United States District Court for the Eastern District of Missouri, The Honorable John F. Nangle, District Judge.
 
 
 2
 The plaintiff, Equal Employment Opportunity Commission, an agency of the United States, sought specific performance of an over-all conciliation agreement entered into between it and the defendant, Contour Chair Lounge Company, Inc., and also sought specific relief for an individual black man, George Martin. The defendant denied that the Commission was entitled to any of the relief sought by it and filed a counterclaim seeking an adjudication that the conciliation agreement was unenforceable as involving "reverse discrimination." Cf. Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), and Weber v. Kaiser Aluminum & Chemical Corp., 563 F.2d 216 (5th Cir. 1977),[1] Cert. granted, --- U.S. ----, 99 S.Ct. 720, 58 L.Ed.2d 704 (1978).
 
 
 3
 The district court held that the Commission was in general entitled to specific performance of the agreement, but not to any relief with respect to Martin. EEOC v. Contour Chair Lounge Co., 457 F.Supp. 393 (E.D.Mo.1978). The judgment provided, Inter alia, that the life of the agreement which had expired by then be extended to September 28, 1980, a date two years from the date of the decree. Neither side was satisfied with the action taken by the district court, and both sides have appealed. Most of the facts of the case are substantially undisputed.
 
 
 4
 The Commission is the federal agency charged with enforcement of the antidiscrimination provisions of the Act, and it often proceeds on the basis of complaints filed by individuals who claim to have been the victims of prohibited discrimination on the basis of race, religion, sex or national origin. 42 U.S.C. § 2000e-2(a). The defendant is an employer covered by the Act and is engaged in the manufacture of upholstered furniture, including chairs, at its place of business in the Eastern District of Missouri. During the period with which we are concerned the defendant employed individuals in various crafts and departments, and some of the craft employees were represented for collective bargaining purposes by the Upholsterers Union, Local 25.[2]
 
 
 5
 In 1972 Lonnie Anderson, a black male, was employed by the defendant. In December of that year and thereafter Anderson filed discrimination complaints against the defendant, and those complaints were investigated by the Commission. While those charges were pending, the defendant discharged Anderson. On January 24, 1974 the Commission made a formal determination that there was reasonable cause to believe that Anderson had been the victim of racial discrimination. The defendant was duly notified of that determination by a formal "determination letter," a copy of which is in the record before us.
 
 
 6
 Thereafter, the defendant and the Commission entered into a formal conciliation agreement that expired by its own terms in August, 1977. That agreement was designed not only to benefit Anderson as an individual but also to benefit blacks as a class, the members of which had been or might be the victims of discrimination at the hands of the defendant. It seems that the agreement was complied with as it affected Anderson, and this case presents no issue as to him personally. The basic controversy between the parties is about an employment "quota provision" appearing in the contract.
 
 
 7
 The agreement provided that during its life the defendant would "use its best efforts to increase its Black utilization rate by hiring one Black for each of its new White employees for the period of this agreement." The agreement also required the defendant to use its best efforts to increase black employment in job classifications in which blacks had not been assigned or in which classifications they were statistically underrepresented, and specifically to hire "a black person" in the sewing and office departments.
 
 
 8
 Finally, the defendant was required to make semiannual reports to the Commission setting out information as to hirings and discharges and indicating names, races, sex, job classifications and rates of pay of persons hired or discharged.
 
 
 9
 In entering into the agreement the parties stipulated that in signing the contract the defendant did not admit that it had been or was guilty of prohibited discrimination.
 
 
 10
 During most of the life of the agreement the defendant consistently failed and refused to comply fully with the reporting requirements of the agreement. After the suit was filed in July, 1977, and shortly before the expiration of the agreement the defendant did file a report that indicated that during the life of the agreement the defendant had employed eleven white persons and only one black.
 
 
 11
 An individual alleged discriminatee, Martin, has worked as an upholsterer in the St. Louis area since 1971 and has been a member of the Upholsterers Union in St. Louis since 1975. In May, 1977 he applied to the defendant for employment as an upholsterer and was denied employment, being advised in that connection that there were no openings. Presumably, he was qualified for the employment that he sought. "Shortly thereafter," to use the district court's term, the defendant hired two white persons, one as an upholsterer, the other as a "cutter."[3]
 
 
 12
 The facts, substantially as above stated, were found by the district court to exist, and that court granted and denied relief to the parties to the extent indicated. We observe, however, that the district judge did not make any specific finding that the defendant had been guilty of discrimination during or prior to the execution of the conciliation agreement. Nor did the trial judge make any finding as to whether the refusal of the defendant to employ Martin was racially discriminatory.[4]I.
 
 
 13
 The enforcement provisions of Title VII are to be found in the various subdivisions of § 706 of the Act, which is codified as 42 U.S.C. § 2000e-5. Initial enforcement responsibility is on the Commission and ultimate responsibility is on the federal courts within the framework of litigation initiated either by one or more aggrieved employees or by the Commission.
 
 
 14
 Basically, the statutory scheme involves investigations by the Commission, efforts at conciliation in instances in which the Commission finds that reasonable cause exists for the belief that employment discrimination has existed, and finally by litigation in the federal courts should conciliation fail.
 
 
 15
 The agency has certain powers, including investigatory powers. And ordinarily an individual discriminatee cannot file a suit against an employer until after an agency finding that there is reasonable cause to believe that the employee has been a victim of discrimination. However, the agency has not been given the powers that Congress has bestowed on older regulatory agencies such as the National Labor Relations Board for example. The Commission cannot make binding adjudications or issue cease and desist orders, and if its underlying findings are challenged in later litigation they are not entitled to the benefit of the "substantial evidence" or "clearly erroneous" rule.
 
 
 16
 If with respect to a given employee litigation in the district court develops, and if the employer loses the case, the court has broad powers to fashion appropriate relief both to prevent continued discrimination in the future and also to remedy the results of discrimination that has occurred in the past. In that connection § 706(g) provides that in proper cases a district court may require "affirmative action" to remedy past discrimination, and that the affirmative action may require hiring or reinstatement of individuals with or without back pay or "any other equitable relief as the court deems appropriate."
 
 
 17
 A private suit until Title VII may be maintained as a class action under Fed.R.Civ.P. 23, and where class action is approved by the district court, members of the class may come into the case or benefit from the relief granted to members of the class even though they have not personally filed discrimination charges with the Commission. It makes no difference that the individual plaintiff who started the action loses interest in the case or turns out not to be entitled to any relief. Franks v. Bowman Transp. Co., 424 U.S. 747, 770-79, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); Albermarle Paper Co. v. Moody, 422 U.S. 405, 414, n. 8, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Reed v. Arlington Hotel Co., 476 F.2d 721 (8th Cir.), Cert. denied, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973); Parham v. Southwestern Bell Tel. Co., 433 F.2d 421 (8th Cir. 1970).
 
 
 18
 In framing its decree the district court may take into consideration the terms of a conciliation agreement that has been worked out between an employer and the Commission. But the court is not bound by those terms and they are not binding on individual discriminatees who had not acceded to them. Reed v. Arlington Hotel Co., supra, 476 F.2d at 724-26.
 
 II.
 
 19
 The power of the district courts to order "affirmative action" in Title VII suits was broadened substantially when Congress adopted the Equal Employment Opportunity Act of 1972, Act of March 24, 1972, P.L. 92-261, 86 Stat. 103. And at least since the passage of that Act affirmative action programs mandated by the district courts have at times required that preferential treatment be accorded to members of minority groups in the area of employment. Such programs, which may and often do involve "quota systems" favorable to minorities, have not only been ordered by the courts but in instances have been agreed upon voluntarily and in fields other than employment, notably in institutions of higher learning. An exhaustive discussion of the subject appears in Weber v. Kaiser Aluminum & Chemical Corp., supra, 563 F.2d 216.
 
 
 20
 This court has consistently upheld such programs since at least 1972, and its decisions include the following: Firefighters Inst. for Racial Equality v. City of St. Louis, 588 F.2d 235 (8th Cir. 1978); United States v. N. L. Indus., Inc., 479 F.2d 354 (8th Cir. 1979); Carter v. Gallagher, 452 F.2d 315 (8th Cir.), Cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972). See also Germann v. Kipp, 429 F.Supp. 1323 (W.D.Mo.1977), Vacated and remanded for dismissal as moot, 572 F.2d 1258 (8th Cir. 1978), a case involving firefighters employed in Kansas City, Missouri.
 
 
 21
 Naturally, affirmative action programs calling for racial or other minority favoring quota systems have been attacked by members of majority groups claiming that the programs amount to "reverse" racial discrimination prohibited by the fourteenth amendment or by Title VII of the Act, or by both the amendment and Title VII.
 
 
 22
 At the moment the present status of these quota system programs is doubtful to say the least. In Bakke, supra, a sharply divided Supreme Court held that the quota system for admission to the medical school of the University of California was unconstitutional. And the holding of the Fifth Circuit in Weber, supra, is now pending before the Supreme Court in certiorari. In that case the district court and the Court of Appeals for the Fifth Circuit struck down a purely voluntary "quota" program established by private contract between an employer and the labor union that was the representative of employees working at one of the employer's plants in Louisiana. The agreement was held invalid as being violative of § 703(a) of the Act, 42 U.S.C. § 2000e-2(a), since there was no history of prior or existing racial discrimination at the plant of the employer affected by the contract.
 
 
 23
 The Bakke case, Supra, did not involve private employment; it did involve fourteenth amendment considerations that are not present in this case. Hence, that decision is not too helpful here. And the fate of Weber in the Supreme Court is obviously uncertain.
 
 
 24
 In these circumstances and in view of what has been our consistent line of decision in this area, we decline to hold that affirmative action programs involving employment quotas favorable to members of minority groups are per se unconstitutional or illegal regardless of the facts of particular cases. We adhere to this court's established view that such programs are valid at least where actual racial discrimination in employment situations has been shown.
 
 
 25
 We turn now to the specific problems presented in this case.
 
 III.
 
 26
 Of primary importance is the holding of the district court that the Commission was entitled to specific enforcement of the general terms of the conciliation agreement, with the life of that agreement being extended for two years from date of the judgment of the district court.
 
 
 27
 We have already set out adequately what the district court found and what it did not find. It is now necessary to look back at what the Commission found prior to the execution of the conciliation agreement.
 
 
 28
 It should be remembered that the Commission's investigation was geared originally to the individual claims of Lonnie Anderson. Those claims were that he, like other blacks, had been subjected to more severe discipline by the employer than white employees guilty of the same offenses; that he had been harassed by the defendant on account of his complaints to the Commission; and that he had ultimately been discharged on account of those activities and on account of his race.
 
 
 29
 The Commission found that there was reasonable cause to believe that Anderson had been subjected to racial discrimination. But, the Commission went somewhat beyond the individual complaints of Anderson.
 
 
 30
 The Commission found from evidence that it had considered that black employees of the defendant were subjected to more severe discipline than whites and as a class were reprimanded more frequently for real or supposed misconduct, and that blacks had been systematically and totally excluded from clerical positions.
 
 
 31
 Having made those findings, the Commission approached the defendant with conciliation in view, and the agreement in suit was the result of the negotiations between the parties.
 
 
 32
 As we understand it, the Commission did not undertake in the course of the proceedings in the district court to prove as an initial proposition that the defendant had been guilty of such discrimination as would have justified the district court in ordering an affirmative action program essentially like the one set out in the agreement. It appears to us that the Commission simply stood on the contract into which the defendant had entered voluntarily, claimed that the defendant had breached the contract, and that specific performance of it over a necessarily extended period should be ordered.
 
 
 33
 The defendant apparently does not question the proposition that if the district court had actually found that the defendant had been guilty of racial discrimination prior to the execution of the conciliation agreement or even during its life, the court would have had the power to enforce the agreement specifically. The defendant earnestly contends, however, that there was no such finding, and that in view of that fact the conciliation agreement was not enforceable, and, indeed, was forbidden by the Act itself.
 
 
 34
 In rejecting that contention the district judge said (457 F.Supp. at 394-95):
 
 
 35
 It is the Court's conclusion that the conciliation agreement and addendum thereto are enforceable. In Weber v. Kaiser Aluminum & Chemical Corp., 563 F.2d 216 (5th Cir. 1977), the court held that 'Title VII outlaws preferences for any group, minority or majority, if based on race or other impermissible classifications, but it does not outlaw preferences favoring victims of discrimination'. Id. at 224. Accordingly, the court held that an affirmative action program contained in a collective bargaining agreement was unlawful where there was no evidence of prior discrimination. Defendant argues herein that since it has never admitted to any discriminatory practice, the conciliation agreement and addendum are unenforceable under the holding of Weber, supra. This Court disagrees. The Weber court specifically noted that:
 
 
 36
 In United States v. Allegheny-Ludlum Industries, Inc., supra, (517 F.2d 826 (5th Cir. 1975)) which dealt with consent decrees eliminating patterns and practices of discrimination in the steel industry, this court emphasized that voluntary compliance in eliminating unfair employment practices is preferable to court action and that private settlement without litigation is the central theme of Title VII. Id. at 223.
 
 
 37
 Here, the conciliation agreement was the result of a discrimination charge filed against defendant. It was entered into by defendant and the governmental agency charged with the responsibility of administering Title VII of the Civil Rights Act of 1964, as amended. Were defendant's argument to be adopted herein, it would mean that the conciliatory powers granted to the EEOC by Congress, See 42 U.S.C. § 2000e-5, would be meaningless since only the courts could order affirmative action. Thus, the Court concludes that the EEOC has the authority to enter into such conciliation agreements and that such agreements are enforceable herein. The Court further concludes that an extension of the reporting period is warranted herein to ensure defendant's compliance with the conciliation agreement.
 
 
 38
 The question raised by the defendant is certainly a valid one and the answer to it is not free from doubt, particularly in view of the present unsettled state of the law. We do not necessarily quarrel with the result that the Fifth Circuit reached in the Weber case. But this case is not Weber. It does not involve an agreement entered into between an employer and a labor union, or even a tripartite agreement including the Commission, with respect to an employment situation which definitely has not been characterized by racial discrimination.
 
 
 39
 In this case the agreement was entered into after (1) a complaint of discrimination was made to the Commission by an employee; (2) an investigation by the Commission had established reasonable cause to believe that the complaining party had been subjected to racial discrimination; (3) underlying findings that to some extent blacks as a class had been discriminated against by the defendant; and (4) later negotiations between the Commission and the defendant that resulted in the conciliation agreement in suit.
 
 
 40
 It should be kept in mind that had the defendant refused to enter into a conciliation agreement with the Commission, the agency might have issued a "right to sue" letter to Anderson and he could have filed an individual or class action against the defendant in the district court. Or, the Commission might have filed its own suit.[5] In either event, the district court would have been empowered, had it found in favor of the plaintiff or plaintiffs, to order affirmative action on the part of the defendant including essentially the same terms as those contained in the conciliation agreement that the district court in fact ordered to be specifically enforced.
 
 
 41
 In such circumstances we think that the agreement here involved can be enforced specifically at the suit of the Commission and in that connection that the life of the agreement can be extended appropriately.
 
 
 42
 We now so hold and affirm the judgment of the district court on this phase of the case.
 
 IV.
 
 43
 As previously observed, the district court made no finding as to whether George Martin was refused employment because of his race. The Commission was denied relief with respect to Martin solely because Martin had never filed a charge of discrimination with the Commission.
 
 
 44
 In view of the nature of this litigation, we do not think that the district court was justified in rejecting the Commission's claim with respect to Martin on the basis just stated. Cf. Franks v. Bowman Transp. Co., supra, 424 U.S. at 747, 96 S.Ct. 1251, and other cases cited in Section I of this opinion.
 
 
 45
 Accordingly, on this phase of the case the judgment of the district court will be reversed. It does not follow, however, that the Commission is automatically entitled to relief as to Martin or as to any particular relief with respect to him.
 
 
 46
 The Martin aspect of the case must be remanded to the district court for further consideration and for a specific finding as to whether the failure or refusal of the defendant to give employment to Martin when he applied for it in late May, 1977, was racially discriminatory. The remand may well involve a supplementing of the record and perhaps an evidentiary hearing. We leave to the discretion of the district court the determination of the nature, timing and scope of such further proceedings as may be necessary in connection with the remand.
 
 
 47
 Affirmed in part; reversed in part and remanded for further proceedings consistent with this opinion. Costs will go against the defendant.
 
 
 
 [1]
 Affirming Weber v. Kaiser Aluminum & Chemical Co., 415 F.Supp. 761 (E.D.La.1976)
 
 
 [2]
 The collective bargaining agreement contained certain provisions relative to seniority rights of employees. The district court ruled that in the event of conflicts between those provisions and the provisions of the conciliation agreement between the Commission and the defendant, the provisions of the bargaining agreement would control. That particular portion of the decision is not challenged here
 
 
 [3]
 We are not aware of the difference between the qualifications of an "upholsterer," the job sought by Martin, and those of a "cutter." Consequently, we do not know whether Martin was qualified as a "cutter."
 
 
 [4]
 The fact that during the life of the agreement the defendant hired only one black as opposed to eleven whites is suggestive but it does not, standing alone, establish that the disparity in hirings during the life of the agreement was discriminatory or that the defendant had practiced discrimination against blacks as a class prior to its entry into the agreement. And the fact that the defendant did not hire Martin but did hire one white upholsterer "shortly" after Martin was turned down does not in itself establish that Martin was denied employment because of his race rather than on some other ground
 
 
 [5]
 While the problem is not involved in this particular case, we note in passing that had the Commission filed a suit as generally authorized by the statute before a suit had been filed by any employee, affected employees might have intervened in the suit as a matter of right under Fed.R.Civ.P. 24(a). On the other hand, had one or more employees sued before the Commission commenced any action, the agency would have been required to seek permissive intervention under Rule 24(b), at least where the relief sought by the agency was no broader than that sought by the individual plaintiff or plaintiffs. McClain v. Wagner Elec. Corp., 550 F.2d 1115 (8th Cir. 1977); E.E.O.C. v. Mo. Pac. R. Co., 493 F.2d 71 (8th Cir. 1974). In other words, the view of this circuit is that in general duplicative litigation of the same claim or claims is not permitted under Title VII